### AMERICAN FOUNDRY & MFG. CO. v. JOSAM MFG. CO.

No. 10215.

Circuit Court of Appeals, Eighth Circuit.
Sept. 6, 1935.

Paul Bakewell, of St. Louis, Mo., for appellant.

Albert R. Golrick, of Cleveland, Ohio (Edwin E. Huffman, of St. Louis, Mo., on the brief), for appellee.

Before STONE and WOODROUGH, Circuit Judges, and RAGON, District Judge.

STONE, Circuit Judge.

In an earlier litigation, appellant was decreed an infringer of claims 1, 2, and 3 of O'Brien patent No. 855,017 (issued May 28, 1907) and of claims 1 to 8, inclusive, of Hirshstein No. 1,348,945 (issued August 10, 1920)—both patents being for roof drain devices. The decree therein, entered in 1922, permanently enjoined appellant from infringing the above claims of these patents. The O'Brien patent expired in 1924 and thereafter, in 1934, appellant was cited for contempt for making and selling two different drain devices (one in 1931 and the other in 1933) which appellee charged were violative of the above injunction because merely colorably different from the device covered by the above claims of the Hirshstein patent. After full hearing, the trial court determined that each of these two devices made by appellant violated the injunction decree; that appellant was guilty of contempt; and that punishment therefor should be payment of all costs, charges, counsel fees, and disbursements of appellee in connection with the contempt proceedings and also all gains, profits, and advantages realized by appellant from sales of these two devices. This appeal is from the order.

While the drain made and sold in 1931 by appellant will be discussed and disposed of hereinafter, the circumstances affecting it are such that it is of small practical importance in this immediate litigation. Very few of these 1931 drains were made and sold; the gain thereon to appellant or the harm therefrom to appellee was negligible and such making and sale were promptly discontinued upon complaint by appellee. As to the different device put out by appellant in 1933, the situation is different since appellant is claiming the right to continue the manufacture and sale of it. These two accused devices differ in construction. We will first consider the 1933, or present device.

### Appellant's 1933 Drain.

The broad issue as to this drain is whether it is or is not merely "colorably" different from appellee's device as covered by claims 1 to 8, inclusive, of Hirshstein. As will be hereinafter shown, all subsequent constructions by a convicted infringer are not triable in contempt proceedings. Only where such constructions are merely "colorably" different from the enjoined device or from the patent is the issue so triable. Such constructions may turn out to be infringements, but if they are more than "colorably" different, the issue of infringement must be otherwise determined than by a contempt proceeding. Therefore, when the issue of infringement is presented in a contempt proceeding, the court must first determine whether it can properly entertain the issue in that proceeding. The propriety of the trial court's determination that it should pass upon the 1933 device in a contempt proceeding is the issue which must be first determined by this court now. This issue is determinable by measuring the facts here by the legal definition of "colorable" as understood in connection with contempt proceedings for violation of a patent infringement injunction order. It is necessary to understand and state such definition.

A patent is a governmental grant of monopoly for the making, selling, and use of a novelty (disclosed therein) as claimed by the patent. Nothing which is not novel (in a patentable sense) as disclosed in the patent is subject to such monopoly even though covered by the paper grant, and nothing having such novelty is so subject unless properly disclosed and properly claimed in the patent. The indefinite character of these limitations on the valid boundaries of any particular patent inevitably produces somewhat of vagueness as to those boundaries except as such are settled by judicial definition. Even judicial definition of such boundaries is often piecemeal be-

118

cause made in reference only to a particular (real or fancied) encroachment thereon. Yet with all this uncertainty, those boundaries exist from the time the patent is granted and therefore must be respected and will be enforced. Thus every outsider must, at his peril, govern his own action by his concept of the place where such boundary lies. He may come safely to its outmost edge, but he may not safely cross the line. Burr v. Duryee, 1 Wall. 531, 574, 17 L. Ed. 650; American Steel & Wire Co. v. Denning Wire & Fence Co., 194 F. 117, 123 (C. C. A. 8). If he honestly—unintentionally—trespasses, he cannot retain any profit therefrom and must make good the damage. If he intentionally trespasses, he will be punished beyond the profit and the damage. USCA, title 35, § 67. Such is the situation before it has been judicially determined that his action is a trespass—an infringement.

A decision adjudging infringement necessarily finds the particular accused device to be within the valid boundary of the patent. The decree usually carries a prohibition against further infringement —not as to any and every possible infringement, but as to the particular device found to be infringement and as to all other devices which are merely "colorable" changes of the infringing one or of the patent. This limitation of the effect of such a decree is occasioned somewhat by the indefinite character of the boundaries of a patent, but more by the character of the remedy—summary contempt proceedings—used to enforce such provisions of a decree. This is merely an application to patent injunction contempt proceedings of the general rule as to all civil contempt proceedings. Oriel v. Russell, 278 U. S. 358, 365, 49 S. Ct. 173, 73 L. Ed. 419; City of Campbell v. Arkansas-Missouri Power Co., 65 F.(2d) 425, 428 (C. C. A. 8). That rule was stated by this court to be that "when it is doubtful whether a decree of injunction has been violated, a court is not justified in punishing for contempt, either criminal or civil, for the reason that no one can say with any degree of certainty that the authority of the court needs vindication or that the aggrieved party is entitled to remedial punishment." City of Campbell v. Arkansas-Missouri Power Co., 65 F.(2d) 425, 427, 428.

The definition of "colorable" in relation to such infringement contempt proceedings is stated in California Artificial Stone Pav. Co. v. Molitor, 113 U. S. 609, 618, 5 S. Ct. 618, 622, 28 L. Ed. 1106, as follows: "Process of contempt is a severe remedy, and should not be resorted to where there is *fair ground of doubt* as to the wrongfulness of the defendant's conduct." (Italics added.) The Court of Appeals for the Second Circuit has expressed the same definition and the procedure dependent on determination of such "colorability" as follows: "Where the alteration in the device is 'merely colorable' and obviously was made for the purpose of evading the decree without essential change in the nature of the device, the courts will try the question of infringement by the new device in proceedings for contempt for violation of the injunction. [Citations omitted.] But *where infringement by the new device is not clear on the face of the matter, and there are substantial issues for the determination of the court,* the plaintiff may not have them determined in contempt proceedings, but must bring a supplemental bill for an injunction covering the new device, or institute a wholly new suit for such an injunction." Radio Corporation v. Cable Radio Tube Corporation, 66 F.(2d) 778, 782 (C. C. A. 2). Italics added. To the same effect are Better Packages, Inc., v. L. Link & Co., 68 F.(2d) 904, 906 (C. C. A. 2); Krentler-Arnold Hinge Last Co. v. Leman, 50 F.(2d) 699, 701 (C. C. A. 1); Schey v. Giovanna, 273 F. 515, 516 (C. C. A. 2); Eureka Tool Co. of Kansas v. Wire Rope Appliance Co., 265 F. 673, 674 (C. C. A. 8); Charles Green Co. v. Henry P. Adams Co., 247 F. 485, 486 (C. C. A. 2); Frank F. Smith Metal Window Hardware Co. v. Yates, 244 F. 793, 796 (C. C. A. 2); National Metal Molding Co. v. Tubular Woven Fabric Co., 239 F. 907, 908 (C. C. A. 1); Crown Cork & Seal Co. v. American Cork Specialty Co., 211 F. 650, 653 (C. C. A. 2); Rajah Auto Supply Co. v. Grossman, 207 F. 84 (C. C. A. 2); Kreplik v. Couch Patents Co., 190 F. 565, 568 (C. C. A. 1); General Mfg. Co. v. Gray, 48 F.(2d) 602, 604 (D. C. Okl.); Electro-Bleaching Gas Co. v. Paradon Eng. Co., 15 F.(2d) 854, 855 (D. C. N. Y.); Wire Rope Appliance Co. v. Eureka Tool Co., 256 F. 677,

678 (D. C. Kan.); Metropolitan Sewing Machine Corporation v. American Perfect Binder Co., 272 F. 520, 522 (D. C. N. Y.).

Under such definition of "colorable" and such outline of the proper procedure dependent thereon, the inquiry here is whether or not there is a "fair ground of doubt" as to infringement by the 1933 device of appellant—if there is such, there can be no punishment for contempt, but appellee must proceed by supplemental or original bill for infringement; if there is no such fair ground for doubt, the matter may be determined in this contempt proceeding.

■ The application for the citation in contempt is, substantially, merely a charge that appellant's 1933 device is only colorably different from the device found to infringe and enjoined in the decree. The response claims radical differences in the 1933 device from the infringing device and from the patent and particularly states the differences relied upon. These differences have to do with what the parties and the patent designate as the "upper member" of the patented construction. Since the device found to infringe was a "Chinese copy" of the construction shown in the patent (particularly by Fig. 1), we need devote no special attention to its description. Such is covered by the description of the patented device. In so far as here material, the patent will be examined—first by a general description so that the issue here as to the 1933 device may be understandable and next more particularly in connection with the determination of that issue.

The purposes of the patented device are to provide an arrangement in connection with the roof end of a drain pipe (1) which will lead seepage water (leaking into or backing up under the top roofing) into the drain pipe and (2) which will catch débris and sediment coming from the roof top and which might clog the drain pipe. The first purpose is accomplished by what the patent calls a "lower member." This member needs no description beyond that it forms a sunken basin attached to the drain pipe top with enlarged capacity to catch direct flow from the roof and (through a water conducting material radiating from the basin under the top roofing) to collect indirect drainage from seepage. This member alone affords the drainage facilities. The upper member is primarily designed to keep this basin and the drain pipe clear of obstructions brought down by water on the roof and which would clog or limit its capacity. This member has nothing to do with seepage water drainage (which normally carries little sediment and no larger obstructions) and it is raised by vertical lugs to permit free passage of seepage under it. It has to do with obstructions coming direct from the surface of the roof. The importance of this member is emphasized in the specifications (p. 1, lines 8–13) as follows:

"My invention relates to an improvement in roof drains and *more particularly to that form of roof drain which is provided with a sediment cup or catchbasin for retaining material which might otherwise enter and clog the drain pipe.*" (Italics added.)

The issue tendered by the response as to the character (colorable or substantial) of differences between the enjoined and the patented devices on one hand and the 1933 device on the other have to do with construction and its resulting operation. Appellant contends that in the enjoined and patented devices the upper member was a unitary single casting (comprising a dome and a sediment basin) the operation of which, when being removed for cleaning, was, of course, single; that this member in the 1933 device consisted of two separate castings (a dome and a sediment cup) which could not in operation be removed together for cleaning; that these differences in construction and in operation are substantial and not merely colorable. These differences were no part of the matter before the trial court in the infringement suit because the accused device there had this upper member in a single casting which operated precisely like the similar member of the patent. The opinion of the trial court clearly shows that no such matter was in his mind in determining infringement.[1] But

---

[1] In comparing the accused device with the O'Brien patent the court says:

"While it must be conceded that the claims of complainant are broad, it is yet apparent that in action, or, rather, in operation, and in effect, the device of the defendant is practically a Chinese copy of that of complainant. Practically the only

the fact that the particular (or similar) construction or features here involved were not before the court in the infringement suit is not determinative that a later construction cannot be properly handled in contempt proceeding. If this were not true, the decree would lose much of its real value. If inconsequential changes in a condemned device necessitated another suit (supplemental or original) for infringement, not only would a patentee be subject to endless harassment by litigation, but the decree of the court would, by such easy indirection, be robbed of much of its effectiveness. The decree changes the situation as to the infringer. While he may, as before, come as near the boundaries of the patent monopoly as possible, yet the decree warns him that he must stay as far away as a "fair ground of doubt" of infringement or he will make himself liable to the summary procedure and the possibly drastic penalties of contempt. Whether he has so done in this instance depends upon whether the above change in construction and its resultant difference in operation create a fair ground of doubt as to infringement of the patent by this 1933 device. Differently stated, the questions are: Is there fair ground to doubt that the patent covered only a single piece upper member; if it clearly covers more, is there fair ground for doubt that the patent was limited to unitary operation in the removal of such pieces for cleaning; and, if the scope of the patent clearly covers other than unitary removal, as to the validity of giving it that scope?

As to the face of the patent. The specifications declare the entire device to consist "of *two* members 3 [the lower member] and 4 [the upper]"; that "the upper or removable member 4 is constructed in the form of a casting having a dome 21 which is either slit, perforated or otherwise grated which is for the purpose to allow a free flow of the water from the roof to drain into the drain pipe and radiating from the bottom of the dome is an upwardly inclined flange 22 shaped in conformity with the inner surface of the inclined wall of the hopper 7, and this member is supported on the lugs 8 and thereby spaced from the member 3 to provide passage for the seepage"; that "whenever it becomes necessary to clear the cup the removable member 4 is easily lifted out of its position and the contents in the cup dumped and the member then placed back in its position as shown in Fig. 1"; that "it will be evident that by removing the dome 21, together with the flange 22 forming the catch-basin, any material caught in the basin can readily be removed and emptied." All of the preceding and every other portion of the specifications (with one exception) and the drawings deal with the upper member as a single piece. That exception is a statement in the specifications that "one object of my invention is to provide a roof drain of the class referred to, in which a removable perforate portion extends a substantial distance above the surface of the roof, while the sediment cup or catch-basin, *which is preferably carried thereby*, is arranged below the upper surface of the roof." Italics added. Statements in the claims having to do with the issue here are as follows: Claim 1, "a removable perforate member * * * and means forming a sediment basin * * * said sediment basin being removable with the perforate member"; claim 2, "a removable cover for said outlet comprising a central perforate portion * * * and a sediment catch-basin positioned around the central portion * * * said catch-basin being removable with the perforate portion"; claim 3, "an upwardly removable perforate cover for the drain outlet, * * * provided with means forming a catch-basin * * * open at the top to receive and collect sediment"; claim 4, "an upwardly removable closure * * * having a flange forming a sediment catch-basin"; claim 5, "a removable perforate member * * * and means forming

---

difference which I am able to discern is in the positioning, and the angle of the orifices which constitute the draining means by which liquid percolating through the floor is carried back into the drain pipe."

In discussing the Hirshstein patent, the court took, as typical, claim 8 which contained the following (italics added): "A removable cover for the outlet, said cover being provided with a central dome-shaped perforated portion extending above the surface to be drained, a sediment catch-basin below the surface to be drained and surrounding said central portion *and removable therewith.*" The only difference between Hirshstein and the accused device is dismissed by the court as "a mere variation, not even reaching the stature of an equivalent."

a sediment basin * * * removable with the perforate member"; claim 6, "a closure * * * provided with a sediment receiving portion * * * and whereby collected sediment will be withdrawn from the outlet with the closure"; claim 7, "a removable closure * * * comprising a central perforate strainer portion * * * and an annular sediment cup surrounding the central portion"; claim 8, "a removable cover * * * being provided with a central dome-shaped perforated portion * * * and a sediment catch-basin * * * removable therewith."

Consideration of the above-quoted expressions from the claims leads to the following conclusions: Claim 4 certainly is a single casting for the sediment cup is a "flange" of the dome; claim 7 would seem to be a single piece for it describes the member as a closure "comprising" the dome and the sediment cup—at least, it is a serious question as to whether it should not be so construed—but be this true or not the entire "closure" is "removable" and it would be importing an omitted quality (easily expressed if intended) to construe the claim to mean separate dome and sediment cup incapable of common removal; claim 3 is more doubtful, but it cannot be properly said that a "removable perforated cover * * * provided with means forming a catch-basin" for sediment is clearly for a two-piece construction where the pieces cannot be removed together and, if not so clearly expressed, the construction is a substantial matter; claims 1, 2, 5, 6, and 8 cover constructions where the dome and the sediment basin may be separate pieces, but where the interrelation is such as to require or to permit removal together. Thus the situation as to these claims is that claims 1, 2, 4, 5, 6, and 8 require a capacity for unitary removal of the dome and sediment cup (whether they be in one casting or in two); while claims 3 and 7 leave it at least doubtful whether the dome and cup are one or two castings and whether, if two, they are incapable of unitary removal. Applying this situation to the issue of "colorability," it is clear that appellant's 1933 construction is clearly outside of all the above claims of the patent unless it comes within claims 3 or 7 and that it is a serious question whether proper construction of either of those two claims would include it. With no construction of either of these claims, in the respect here important, by the trial court or any other court and in view of the substantial question presented by the proper construction of these two claims, it is clear that the "fair ground of doubt as to the wrongfulness of the defendant's [appellant's] conduct" [California Artificial Stone Paving Co. v. Molitor, 113 U. S. 609, 618, 5 S. Ct. 618, 622, 28 L. Ed. 1106] is present and that "infringement by the new device is not clear on the face of the matter, and there are substantial issues [construction of claims 3 and 7] for the determination of the court" [Radio Corporation v. Cable Radio Tube Corporation, 66 F.(2d) 778, 782, 783 (C. C. A. 2)]. Such being the situation, the infringement *vel non* by the 1933 device may not be determined in a contempt proceeding, but must be relegated to an infringement action either by supplemental or original bill.

While the foregoing is sufficient to dispose of this issue, it may be added, as makeweight, that this patent is in nowise a pioneer, but (as said by the trial court in the infringement case) is a "combination of features and parts, old in the art, and in germane and kindred arts" with a "novel positioning of such parts so as to produce a new, useful result, or an old result in a more facile, mechanical and effective way." In this connection—as possibly limiting the scope of the patent and, therefore, the construction of its claims—there are various citations in the record which would merit careful consideration, if determination of such construction were before us. Among these are Clapp No. 134,978, Pierce No. 183,701, Rile No. 853,598, and, possibly, O'Brien No. 855,017.

In the trial court's opinion on the contempt proceeding appears the following:

"In the latter accused device, the two parts were not necessarily removable together. But, since the strainers in both plaintiff's and defendant's devices are slightly cone-shaped, it is wholly possible (as was shown on the hearing) to so mold the two parts as to make the strainer and the sediment cup removable together, as in the preferred form of the Hirshstein patent."

Also, appellee urges, in its brief, that the space between the dome and the cup

is so slight that small casting defects would cause the two to adhere so that the cup would come out with the dome when the latter was lifted.

It is quite clear that the essential difference in the 1933 device from the patent which has influenced our determination above is that the dome and sediment cup in the former are incapable of unitary removal. The record here and the full size models of the 1933 device before us are barren of any affirmative showing that it is possible so to mold the two parts (dome and cup) as to make them removable together. However, the rather close juxtaposition of these parts when in position is such that purposed or accidental enlargements of either part *might* cause binding of the cup on the dome and thus not only allow but necessitate unitary removal. But this record is barren of any evidence that such has actually occurred and the full sized constructions presented to us and used by both parties in argument do not and cannot work that way. We have considered and determine this matter on the basis of the evidence before us which is that the two parts are not together removable by lifting either one —in short, that they are physically out of such close contact. It is easy enough for appellant to maintain that complete separation. If it should, in the future, fail to do so, such construction would clearly be a contempt.

### Appellant's 1931 Drain.

The final decree in the infringement action was entered January 5, 1922. So far as this record reveals, no drains were made by appellant which appellee deemed objectionable until 1931. July 20, 1931, counsel for appellee wrote appellant that it had come to his attention that appellant was selling a drain (known as type No. 1011) which appellee regarded as an infringement of Hirshstein and a violation of the above decree. The letter ended with a demand to cease, to render a statement of such drains in stock and of such as theretofore sold, and an offer of restitution. This letter was at once referred to its counsel by appellant. Counsel at once wrote (July 22, 1931) to counsel for appellee stating that the particular attorney who was looking after appellant's business was away until the forepart of August; that the matter would be brought to his attention on his return; and that appellant had been in-structed not to "put out" any of such devices in the meanwhile. On return of such counsel, he wrote (August 6, 1931) a lengthy letter to counsel for appellee. This letter contained the statements following: That from March, 1931, to July 22, 1931, appellant had made 45 drains of "type No. 1011" at an actual cost of $358.30, of which it had sold 41 for a. total of $347.50 (having 4 in stock); in May and June, 1931, appellant had made 11 drains of a different style (known as No. 1013) at an actual cost of $71.-77, which it had sold for a total of $90.-60; that the No. 1013 differed from No. 1011 only in that "the lower pan present in No. 1011 was omitted" (this being a feature of the lower drain member and unconnected with the upper member which comprised the dome and sediment cup); that both types differed "radically" from the Hirshstein patent and from the enjoined device in that the upper removable member was not integral but was made up of two separate parts, the dome and the sediment cup; *that such constructions had been honestly made in belief they were different from the patented device and the enjoined device; that none had. been made or sold since counsel (on July 22, 1931) had instructed them to cease;* that counsel believed the two above types radically unlike the patent and the enjoined device because of the above separation of the upper member into two separate pieces; that appellant would not make or sell any more of either type; that blueprints of the two types were inclosed. The substantial close of the letter was as follows:

"Under the circumstances, I feel quite certain that your client could not successfully maintain contempt proceedings against my client; and, as for a separate suit, under the circumstances I do not believe that a suit *in equity* against my client could be maintained. As to a suit *at law,* even if infringement were made out (which I doubt), the amount of *damages* recoverable would be practically nil.

"I am writing you thus frankly because I trust that what I have said herein and my client's positive assurance (which I here give you on my client's behalf) that it will not make or sell, during the remainder of the life of said Hirshstein patent, any more roof drains of the construction of its said 'No. 1011' and 'No. 1013' roof drains should satisfy

the demand of your client in the circumstances."

▮ Broadly, the purport of this letter was that appellant had acted in good faith, but (although it believed its action unobjectionable) to avoid litigation would discontinue the objectionable types from which its total profit had been $8.03, and that it thought such action should "satisfy the demand [of appellee] * * * in the circumstances."

To this letter, appellee's counsel answered that they believed the types to be infringement; that they wished to know whether appellant intended "to cease all manufacture" of the two types; that if this was intended, "some simple adjustment of the matter, in all probability, can be quickly determined"; that attention was directed "to the very clever way in which the American Foundry drains have been designed for the purpose (in our opinion) of omitting the supply of the separate sediment cup with the strainer, thus leaving each sale open to future manipulation whereby the cup can be supplied after installation. To leave the situation open whereby American Foundry would have an opportunity, either directly or through the actions of others, to supply roof drains in this manner obviously would be unfair to our client"; that "if it is the desire of your client to settle the claim in an amicable manner, we, of course, would be willing to further the situation to such an end but we request that we first receive a declaration of your client's intentions regarding the sale of the 1011 and 1103 [1013] drains and similar without the sediment cup."

To this counsel for appellant replied reiterating the intention of appellant not to make or sell any of the two types; stating, "In regard to the charge or insinuation made in the second paragraph of your letter of Aug. 13th to which I have directed my client's attention, I desire to say that my client denies most positively that it has in the past or that it has any idea in the future of making roof drains of the construction illustrated in the blue prints which I sent you with my letter of Aug. 6th (roof drains Nos. 1011 and 1013) and then selling one part of the drain, omitting the sediment cup, with the idea of providing the sediment cup separately or having its customer provide the sediment cup," and ending,

"Trusting that in other respects this letter of mine, supplementing as it does my very definite letter to you of Aug. 6, 1931, will prove satisfactory to you and your client." This letter, written August 14, 1931, apparently ended the matter as to these types. So the matter rested until appellant brought out its 1933 drain (above discussed).

November 1, 1933, counsel for appellee wrote appellant, as follows:

"In July, 1931, we notified you on behalf of our client, Josam Manufacturing Company, of infringement of the Hirshstein Patent 1348945, particular reference being made to your drains numbered 1011 and 1013. Through your patent counsel, Mr. Paul Bakewell, repeated statements as to your good faith and desire not to infringe the patent were extended to our client. You agreed to cease the infringement at once and not sell any drains which might be on hand, and due to the assurances extended to us by your counsel, we refrained from taking steps to have you cited for contempt of court for violating the restraining order provided for in the decree of Equity No. 5462, Federal District Court Eastern Division. Also, we did not press you for damage claims.

"It now has come to the attention of our client that you are again infringing the patent by selling your drains numbered 1001, 1003, 1103 and 1101 [the 1933 types].

"We accepted Mr. Bakewell's assurances that you would cease the manufacture and sale of all such drains in the spirit in which it was offered, but it now is apparent that he cannot control your conduct and unless you cease at once the activities complained of and make restitution therefor, we will be forced to take summary action against you."

To this appellant's counsel promptly replied that, as to the 1931 types, appellant had entirely refrained as promised in the correspondence in regard thereto; that, as to the 1933 types, appellant deemed them entirely outside the patent and the decree and intended to continue making and selling them. This contempt proceeding resulted by the application filed February 26, 1934.

After setting out its defense that the 1931 drains were neither infringements nor subject to determination in a contempt proceeding, appellant (in its response) sets

**124**

out the history of the above correspondence in 1931 (attaching copies of the letters), claims its discontinuance of such types was "merely for the sake of peace"; its strict adherence thereto and its reasonable belief that appellee was "satisfied with the position taken" in the letters of August 6 and 14, 1931.

The difference in the upper member (dome and sediment basin) between appellant's 1931 and 1933 drains is—as to Hirshstein—marked. In both, the dome and basin are separate castings, but in 1931 the dome had lugs projecting from its bottom which rested below the basin and which necessarily operated to remove the basin when the dome was lifted. The 1933 drains were quite different in that the two parts were, in normal use, incapable of unitary removal. Obviously, the 1931 drains were much nearer the patent. For the purpose of the matter presently to be stated, we may (without examination) concede that the 1931 drain infringed the patent. But the question remains as to whether, when this contempt proceeding was filed, appellant was subject thereto. So far as this record shows, it had commenced making drains in 1931 which it believed in good faith were without the patent and the enjoined drain; when appellee charged otherwise (still protesting its right), it promptly desisted; it complied with appellee's demand as to a report on its making, selling, and business results on those drains; for more than two years, that matter remained closed. There is no question that there would have been nothing further concerning the 1931 drain had not the very different 1933 drain occasioned this proceeding. When it became necessary to attack the 1933 drain, appellee added the 1931 merely as a makeweight. The entire practical advantage of this proceeding to appellee is to prevent the 1933 construction.

What standing would appellee have had in applying on February 26, 1934, for a contempt order as to the 1931 drains only? At that time, for more than two years appellee had secured, without legal proceeding, the complete cessation of the 1931 drains and it had secured this at the known price of "peace." Even more, the profit to appellant through the 1931 drains was practically nil and the damage to appellee through these few sales could not

have been appreciable. Assuredly, the court would not have permitted use of its drastic remedy of contempt to punish in such a trifling situation attended by a delay which could not have been explained away. Small standing would appellee have had. Certainly, the importance or character of this 1931 situation cannot be changed by tailing it in to a proceeding essentially founded on a much later and very different construction when the proceeding as to that later construction is erroneous. What justification would there be for a determination in this court saddling the costs and expenses of this entire litigation on appellant when appellee has lost the only worthwhile thing involved therein or in having an accounting for profits or damages as to the 1931 drains when the parties by their actions and by the record here concede either profit or damage to be inconsequential?

### Conclusion.

We think the only equitable method of disposing of this entire appeal—in view of our determination as to appellant's 1933 construction—is to reverse the order appealed from with instructions to set the order aside and to dismiss the contempt proceeding at the costs of appellee. It is so ordered.