The **D. E. STEARNS COMPANY,** a partnership composed of **Dick E. Stearns and Ellen Belson Stearns, Plaintiff,**

v.

**Lilburn J. BRASHEAR, George B. Wren, Jr.,** and **Mechanical Electrical Development Company,** a partnership composed of **Lilburn J. Brashear and George B. Wren, Jr., Defendants.**

Civ. No. 6673.

United States District Court
W. D. Missouri, W. D.
Aug. 30, 1956.

Thomas E. Scofield, Kansas City, Mo., Browning, Simms & Hyer, Houston, Tex., for plaintiff.

C. Earl Hovey, Robert L. Jackson, Claude A. Fishburn and Orville O. Gold, Kansas City, Mo., for defendants.

DUNCAN, Chief Judge.

This matter is before the court on motion for an order holding defendants George B. Wren, Jr., and Pipeline Inspection Co., Inc., in contempt of court for the violation of an injunction issued against the said George B. Wren, Jr., enjoining Wren from infringing Claim 1 of what is designated as "Stearns Patent No. 2,332,182".

On November 22, 1950, the D. E. Stearns Company, a partnership composed of Dick E. Stearns and Ellen Belson Stearns, filed an action in this court against Lilburn J. Brashear, George B. Wren, Jr., and Mechanical Electrical Development Company, a co-partnership composed of Lilburn J. Brashear and George B. Wren, Jr., alleging that the plaintiffs were the owners of said Patent No. 2,332,182 and that Brashear and Wren, doing business as the Mechanical Electrical Development Company, had, since February 15, 1950, infringed upon Claim 1 of said Letters Patent, by making, using and vending an electrical exploring device, for detecting defects in insulating coating by employing the invention defined by Claim 1 of the Letters Patent.

Thereafter, on May 12, 1952, the parties settled the differences involved in the controversy, and a consent decree in the following language, was entered (Caption omitted):

"First: The Stearns Patent No. 2,-332,182, issued October 19, 1943, is good and valid in law.

"Second: Defendants have infringed upon claim 1 of said patent by the manufacture and lease or rental of an electrical exploring device employing a rolling coiled spring electrode and pusher assembly identified herein by the trade-name 'MEDCO'.

"Third: That a perpetual injunction is hereby granted, awarded and decreed to plaintiff against defendants, individually and jointly, their officers, directors, associates, affiliates, agents and servants, and each of them, and any others controlled by them from directly or indirectly—(a) infringing upon said Letters Patent 2,332,182 during the unexpired term of said Letters Patent; (b) making or causing to be made, selling or causing to be sold, using, or causing to be used, leasing, or causing to be leased, any device embodying or containing the invention covered by claim 1 of said Letters Patent without prior agreement with plaintiff or plaintiff's successors in title to said patent; (c) contributing to the infringement of, or encouraging, inducing, aiding or abetting the infringement of claim 1 of said Letters Patent 2,332,182 in any way whatsoever.

"Fourth: That there shall be no award of damages for past infringement, the parties having settled the matter of damage between themselves.

"Fifth: That each party shall pay its own costs, and that there is no allowance for attorney's fees of either party."

As a part of the settlement, the plaintiff granted a licensing contract to the defendant Wren, Jr., and Brashear for the making, licensing or selling of the device covered by the plaintiff's patent.

On May 9, 1952, the defendant Wren, Jr., entered into two agreements with the Stearns Company, under the terms of which the defendant Wren was to pay to the plaintiff certain royalties for the manufacture and sale or rental of the MEDCO or STEARNS device. Sometime prior to July, 1953, the defendant Wren stopped paying royalties, and on July 2, 1953, plaintiff notified the defendant Wren, Jr., that unless the breaches specified were corrected prior to August 1, 1953, the licensing agreements would terminate in accordance with Articles VIII and V of said agreements.

The contract for manufacture, lease or rental, entered into between Stearns and Wren on May 9, 1952, provided among other things, in Article II thereof:

"* * * Licensee hereby acknowledges the validity of the aforesaid Letters Patent and Licensor's title thereto and agrees not to contest the same, during the life hereof, directly or indirectly."

The contract for manufacture and sale, executed the same day, contains approximately the same language in Article II thereof. Article IV of the manufacture, lease or rent agreement thereof, further provided:

"IV. In the event that electrode and electrode pusher combinations actually, or such as made, used, leased or rented by Licensee shall be adjudged not to infringe any claim of patent 2,332,182, or shall be covered only by a claim or claims of said patent that have been adjudged invalid by a court of competent jurisdiction, from which judgment no appeal has been taken within the period prescribed by law for such appeal, then the obligations of Licensee hereunder to pay royalties and make reports shall cease until

another court of equal authority shall hold said claim or claims valid and infringed, in which event the obligation to pay royalties shall forthwith be reestablished. During any interim that Licensee is not obligated hereunder to report or pay royalties the license shall still otherwise remain in force."

No such provision is made in the sales contract.

During the time the licensing agreements were in effect, and before the consent decree had been entered, Wren and Frank W. Cummins had been experimenting and working on a holiday detecting device, which ultimately culminated in the accused device, and its manufacture. The partnership was operated under the name of "Pipeline Inspection Co."

On May 6, 1953, the Pipeline Inspection Co., was incorporated, designating Wren, Jr., as President, the legal work of such incorporation having been done by Frank C. Rayburn, an attorney of Kansas City, who was advising Wren during that time. The incorporators were Wren, Jr., Rayburn and Cummins. The only change made in the name of the company, which had been operating as a co-partnership, was to add the letters "Inc." The assets of the co-partnership of Wren and Cummins were transferred to the corporation, and it continued in the business of manufacturing, selling or leasing electrical inspection equipment known to the trade as "holiday detectors" under the trade name "SPI". As a result, Pipeline Inspection Co., Inc., is a party to this controversy.

Following the filing of the motion for an order holding the parties in contempt, the defendant Lilburn J. Brashear did, on October 18, 1954, admit the charge of infringement alleged in the motion, and authorized his attorney to consent to an order holding him in contempt. Pursuant to that admission and request, an order was entered on October 19, 1954, with respect to the defendant

Lilburn J. Brashear. Therefore, he is not now concerned in this controversy.

The defendants Wren, Jr., and Pipeline Inspection Co., Inc., filed a motion to strike plaintiff's motion for contempt, first, on the ground that the Pipeline Inspection Co., Inc., was not a party to the original suit, and that the defendant Wren, Jr., during the period complained of in the motion for contempt, had not, after August 1, 1953, individually committed any acts of infringement, or in any other way violated the terms of the injunction, acting in all respects as an employee of Pipeline Inspection Co., Inc.

Second, that the device which was being manufactured, sold or leased by Wren, Jr., or Pipeline Inspection Co., Inc., was a different device from the one referred to in the injunction or described in the patent in suit, and that said device was not the equivalent, or a colorable imitation of the patented device. It was upon this contention that the motion for contempt was presented and heard by the court.

The defendants strenuously sought to attack the validity of the Stearns patent and to explore the prior art, contending that it was void. This defense was denied to the defendants on the ground that the defendants had admitted the validity of the patent in the consent decree, and would not be heard to question its validity in the contempt proceeding. T. L. Smith Co. v. Cement Tile Machinery Co., 8 Cir., 1919, 257 F. 423,—also as to binding effect of consent decree and prohibition of checking prior art, except where patentee tries to include new machine in old patent, Roberts Cone Mfg. Co., v. Bruckman, 8 Cir., 1920, 266 F. 986.

In Stearns v. Tinker & Rasor, 9 Cir., 1955, 220 F.2d 49, the court had before it the question of the validity of the Stearns patent, and in an unusually well considered opinion, discussed the entire history of the development of the device, including all of the patents in the prior art, concluding that the Stearns patent was valid.

A brief discussion of the device will aid in an understanding of the court's position here. The problem of finding a satisfactory device for detecting "holidays" has covered a period of many years, and, because of the results sought to be accomplished, entailed considerable difficulty in perfecting a reasonably satisfactory solution. Pipelines which are concealed in the earth are first encased, or covered, with an asphaltic coated paper before they are lowered into the earth. These protective coverings are designed to prevent corrosion and damage from electrolysis and, inevitably, in the wrapping of such pipes, small areas of the pipe will be left exposed. It is the purpose of the devices with which we are concerned here, to detect those exposed areas, and to indicate them, so that they may be remedied before the pipe is laid in its trench. The desired result is achieved by a spring electrode "rolled" or "pushed" along the area of the pipe by an electrically charged mechanism. When the spring electrode comes in contact with the exposed area of the pipe, that fact is registered on the mechanism.

The Stearns patent was issued October 19, 1943, and Claim 1 thereof, in controversy here, described the device as—

"An electrical exploring device for detecting defects in an insulating coating on an elongated member which comprises an exploring electrode in the form of a coiled spring adapted to extend about such member and having its ends secured together to completely embrace such member, and means rotatably engaging and forming a movable electrical contact with said spring at a position remote from the surface of said member for connecting said spring to a high voltage testing circuit and for rolling said spring along such elongated member."

The court has before it the drawings of the patented device, the actual manu-

factured device of the plaintiff, and the accused device manufactured by the defendants. Each device is divided into two component parts—what we may define as a "carried device" and a "carrier device"—the respective elements on each device perform the same function, but are operated in a different manner, as will be hereafter described.

The sole question before the court is whether or not the accused device is simply a colorable imitation of the patented device, thereby performing the same function in substantially the same manner, as contended by the plaintiff, or whether it is substantially a different device, as defendants assert.

The defendants claim that the "SPI" device which they are manufacturing, selling or leasing, while performing the same function as that of the patented device, i. e., detecting of holidays by the use of the spring electrode, does so in a substantially different manner from the patented device, or the device described in Claim 1 of the Letters Patent. Thus it is their conclusion that the "SPI" device does not infringe upon Claim 1.

 If the accused device is merely a colorable imitation of the patented device, then the defendants are guilty of contempt. If it is not a mere colorable imitation, but is substantially different, or there is a fair ground of doubt as to the defendants' wrongful conduct, then the court may not determine that question in a contempt proceeding. In that eventuality, it becomes the patentee's burden to file a supplemental bill for injunction covering such device, or to institute a wholly new suit for such injunction.

In American Foundry & Mfg. Co. v. Josam Mfg. Co., 8 Cir., 1935, 79 F.2d 116, at page 118 in an opinion by Judge Stone, Chief Judge, the court stated:

"A decision adjudging infringement necessarily finds the particular accused device to be within the valid boundary of the patent. The decree usually carries a prohibition against further infringement—not as to any and every possible infringement, but as to the particular device found to be infringement and as to all other devices which are merely 'colorable' changes of the infringing one or of the patent. This limitation of the effect of such a decree is occasioned somewhat by the indefinite character of the boundaries of a patent, but more by the character of the remedy—summary contempt proceedings—used to enforce such provisions of a decree. This is merely an application to patent injunction contempt proceedings of the general rule as to all civil contempt proceedings. [Citing cases]. That rule was stated by this court to be that 'when it is doubtful whether a decree of injunction has been violated, a court is not justified in punishing for contempt, either criminal or civil, for the reason that no one can say with any degree of certainty that the authority of the court needs vindication or that the aggrieved party is entitled to remedial punishment.' [Citing cases].

"The definition of 'colorable' in relation to such infringement contempt proceedings is stated in California Artificial Stone Pav. Co. v. Molitor, 113 U.S. 609, 618, 5 S.Ct. 618, 622, 28 L.Ed. 1106, as follows: 'Process of contempt is a severe remedy, and should not be resorted to where there is *fair ground of doubt* as to the wrongfulness of the defendant's conduct.' (Italics added.) The Court of Appeals for the Second Circuit has expressed the same definition and the procedure dependent on determination of such 'colorability' as follows: 'Where the alteration in the device is "merely colorable" and obviously was made for the purpose of evading the decree without essential change in the nature of the device, the courts will try the question of infringement by the new device in proceedings for contempt for violation of the injunction. (Citations omitted.) But

*where the infringement by the new device is not clear on the face of the matter, and there are substantial issues for the determination of the court,* the plaintiff may not have them determined in contempt proceedings, but must bring a supplemental bill for an injunction covering the new device, or institute a wholly new suit for such an injunction.'" [Citing cases.]

That Court concluded by stating:

"Under such definition of 'colorable' and such outline of the proper procedure dependent thereon, the inquiry here is whether or not there is a 'fair ground of doubt' as to infringement by the 1933 device of appellant—if there is such, there can be no punishment for contempt, but appellee must proceed by supplemental or original bill for infringement; if there is no such fair ground for doubt, the matter may be determined in this contempt proceeding."

Unquestionably, the two devices perform the same function, i. e., detecting "holidays" in metal pipe. In both devices "holidays" are detected through the use of the electrically charged spring electrode that is "rolled" or "pushed" over the pipe, and are indicated through a signalling mechanism. The spring electrodes are coils of spring steel. The electrodes employed in the operation of both devices are similar in appearance. The material difference is that the electrode used in both models of the patented device is so constructed as to have one end, which I have designated as a "plug" or "head", insert into the slot of the other end so as to completely encircle or embrace the pipe and be supported by it; whereas the electrode used in both models of the accused device is not so constructed as to have the ends secured together, completely encircling the pipe and being supported thereby. Instead, into each end of the electrode used in the accused device is secured a disk, such disks being identical, each disk containing a hole into which is placed an "axle" or "pin" with a flange on the inner end thereof so that it may be prevented from pulling out. On the outer end thereof is a "head" or "knob" which is designed to fit into a keyhole slot in the frame hereafter to be described, in such manner as to completely restrain such axle or pin from revolving.

In the carried model of the patented device, the electrode is pushed along the pipe by means of what the plaintiff describes as a "wand" which is a stick approximately three feet long, to the end of which a semi-circular sleeve bearing is attached. An electric wire is extended through this "wand" and is connected to the semi-circular bearing. When this bearing is placed against the electrode and pressure is exerted, it causes the electrode to revolve and move along the pipe. A device is carried upon the body of the operator which contains batteries, and to this device the wire extending through the "wand" is connected and transmits electrical energy through the wire and the semi-circular-shaped bearing into the spring electrode. When the electrode is pushed along the pipe and comes in contact with a "holiday" this fact is transmitted through the spring and the bearing coming in contact therewith, and registers on the mechanism carried upon the body of the operator. If the "wand" or "pushing" device is ever out of contact with the spring, the electrical contact is broken. This results from the fact that there can be no contact between the spring electrode and the pushing mechanism or wand except by physical contact of one against the other by the operator.

The "carrier" model of the device is a small carriage approximately 8″ high, 12″ long and 9″ wide. It has four wheels, one at each corner, so placed as to be adjusted to the contour of the pipe. Handles are placed on each side at the top of the carriage to aid the operator in pushing or adjusting it to the desired position on the pipe. On the rear of this carriage, space is provided for securing the batteries which supply the electrical energy. To the other end of the carriage, a removable "tongue" or element is at-

tached, which also has four small wheels or bearings. These small wheels or bearings are so constructed as to form a "yoke" or clamp which rotatably engages the electrode. When this "yoke" or "clamp" engages the spring electrode, electrical contact is created between the carriage and the electrode, and when the carriage is pushed or pulled, the spring electrode is caused to revolve along the pipe. Like the "wand", when the "yoke" or "clamp" is removed from the electrode, the electrical current is broken.

It is my conclusion that the structure is clearly embraced by Claim 1.

The accused device, like the patented device, as I have heretofore stated, is composed of two models, the "carried" model, and the "carrier" model. The defendants describe their accused device as follows:

"The carriage model has a pusher in the form of a frame having spaced metal plates with a roller or wheel at one end adapted to engage the pipe to be tested and support that end of the frame. The other end is connected and supported by the carriage. The carry model includes a pusher which consists of a frame having spaced metal side members each end of which are supported on rollers or wheels, and in that structure a handle is connected to the frame to enable the operator to move the frame along the pipe. In both structures, the spring is a helix or coil spring having disks fixed in the ends thereof. Ball bearings are mounted in the disks and rotatably support axles which extend from the disks and are adapted to be connected to the opposite side and plates of the frame, said axles extending through slots in the frame side members. The axles also have lugs which engage the sides of the slots in the frame to prevent rotation of the axles.

"In applying the spring to a pipe, the axle at one end of the spring is connected to one side member of the frame and then the spring extended around the pipe and the axle at the other end of the spring connected to the other side frame member whereby the frame supports said spring and then when the frame is moved along the pipe to be inspected, the spring rolls in the same manner as a wheel rolls on an axle. The electrical potential is applied through a conductor connecting the electrical apparatus in the case to the frame, and then flows through the frame member, ball bearings and disks to the spring adjacent the pipe. There is another parallel circuit whereby the current flows through the frame members to the metal roller at one end thereof whereby the roller and spring are separate and independent exploring electrodes each exploring its own respective portion of the circumference of the pipe coating. The spring is not entirely supported by the pipe alone. Nothing engages the outer periphery of the spring either to provide mechanical energy to roll the spring or to apply electrical potential to the spring."

In this device, when the electrode is "pushed" or "pulled", the disks secured into the ends of the spring electrode turn on the axles as it turns. The movement of the electrode is identical in the carried model and the carrier model. The device or mechanism carried upon the body of the operator is substantially the same as that used in operating the carried model of the patented device. It carries the batteries to which the wire is attached which supplies the electricity to energize the electrode. The mechanism to which each end of the electrode is attached is similar in the carried model and the carriage model of the accused device. The frame on the carried model is constructed of metal plates, approximately 6″ long, 1½″ wide and ⅛″ thick, secured parallel to each other, the central portion thereof being approximately ⅜″ apart and flaring at each end to slightly more than an inch. Between the plates on each end is a wheel 2″ in diameter and approximately ¾″ wide.

One of these wheels is metal, while the other is of rubber, a non-conductor of electricity. In the center, or side, of each plate is a key-hole slot designed to receive and securely hold the ends of the electrode. Also attached to the top of the frame is a pusher handle or "wand" as described in the patented device. This handle is secured by means of a bolt or bolts so as to be easily raised or lowered. Through this handle a cord is extended, which, when attached to the device carried by the operator, causes the flow of electrical energy through the connecting device into the electrode.

When the electrode is thus secured to the frame, it may be pushed or pulled along the pipe. The pusher handle may be left in any position on top, side or bottom of the pipe without breaking the electrical contact. So long as the electrode is connected to the frame and the cord to the energizing agency, contact is maintained.

This is not true of the patented device. To provide electrical contact, especially with their "carried" model, the operator must at all times maintain physical contact between the sleeve bearing and the electrode.

The carriage element of the carrier model of the accused device is substantially the same as that of the patented device. It is approximately of the same dimension and carries the batteries in the same manner. There are four wheels so attached to the bottom thereof as to be adjusted to the contour of various sized pipe. Handles are set on each side of the top to facilitate its operation. It does not have a "tongue", "arm" or "yoke" attached to the four small wheels or roller bearings rotatably engaging the electrode, thereby causing it to be pushed along the pipe and depending upon such engagement for electrical contact. Instead, it has an element comparable to the frame described for use in operating the carried model, except it has but one wheel instead of two. The plates are 4½" long—a ¾" metal wheel is secured between the plates at one end,

the plates are then brought together to within ⅜" of each other. To the other end thereof is attached a fibrous member which is secured to the frame of the carriage and so designed as to move up and down with the surface over which the small wheel moves. In the side of each of the plates there is a key-hole slot to receive the pin or axle attached to each end of the electrode. When the ends of the electrode are so attached, both the electrode and the carriage are securely bound to the pipe. Electricity is supplied from batteries in the carriage through wires leading from the batteries to the frame to which the electrode is attached, thus energizing the electrode. Until the battery wires or the electrodes are disconnected, the current is continuous to the electrode, regardless of the position in which the carriage or pusher device may be on the pipe.

The reason for the two models of each device is that under some conditions it is not possible, or at least not feasible, to use the carrier model, but is possible and feasible to use the carried model.

From an analysis of the two devices and my observation of the manner in which they function, it seems to me that the accused device represents more than a colorable imitation of the patented device, and that, while the result produced by each is substantially the same, the method by which that result is produced is substantially different, certainly to the extent that a fair ground of doubt exists as to the question of infringement.

That being the finding and conclusion of the court, in view of American Foundry & Mfg. Co. v. Josam, supra, the "Motion for an order holding defendant, George B. Wren, Jr., and Pipeline Inspection Co., Inc., in contempt of injunction" must be and is hereby overruled.

In view of the court's conclusion, other questions presented in the trial are not necessary for determination at this time.

If the parties desire findings of fact and conclusions of law in addition to those made in this memorandum opinion, they may be submitted in accordance herewith, within fifteen days after this date.